# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>ISHMAEL PETTY, federal inmate register number 10783-042, currently in custody at the US Penitentiary Administrative Maximum, located at 5880 Highway 67 South, Florence, Colorado. | )<br>)<br>)  Case No. 25-sw-400-NRN<br>)<br>)<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the <u>State and</u> District of <u>Colorado</u>, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1111 | Murder |

The application is based on these facts:

- ☒ Continued on the attached affidavit, which is incorporated by reference.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

__s/Amber K. Cronan____
*Applicant's signature*

SA Amber K. Cronan, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by <u>telephone</u>.

Date: 03/18/2025                                          /s/ N. Reid Neureiter
                                                                      *Judge's signature*

City and state: Denver, CO                       N. Reid Neureiter
                                                                 United States Magistrate Judge
                                                                 *Printed name and title*

## ATTACHMENT A

## **PERSON TO BE SEARCHED**

ISHMAEL PETTY, federal inmate register number 10783-042, currently in custody at the US Penitentiary Administrative Maximum Facility, located at 5880 Highway 67 South, Florence, Colorado.

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED FOR**

A DNA sample from ISHMAEL PETTY, in the form of buccal cells on an oral swab. The oral swab will be collected from the inside cheek portion of the mouth to sufficiently collect buccal cells.

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Amber K. Cronan, being first duly sworn, hereby depose and states as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the FBI and have been since 2008. I am currently assigned to the Denver Division of the FBI, and specifically to the Colorado Springs Resident Agency. I investigate crimes of violence, including homicides and assaults, in the normal course of my duties and was assigned to investigate crimes occurring at the Federal Correctional Complex in Florence, Colorado between 2011 and October 2024. I have been a fully trained member of the FBI's Evidence Response Team (ERT) for over fourteen years and am familiar with the proper procedures for collecting and preserving evidence, to include DNA evidence. I have personally participated in the collection of DNA samples and am fully familiar with the facts of the case.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from Bureau of Prisons (BOP) staff and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. Based on my training and experience and the facts set forth in this affidavit, I submit there is probable cause to believe the collection of DNA from Ishmael Petty for the purpose of comparison to a homemade knife seized following the death of an inmate with initials L.H. will provide evidence to support the violation of 18 U.S.C. § 1111 (murder).

## FACTS IN SUPPORT OF PROBABLE CAUSE

*Overview of certain people involved*

4. **Ishmael Petty** is a federal inmate currently incarcerated at the US Penitentiary Administrative Maximum (ADX) in Florence, Colorado. Petty was initially incarcerated in the BOP for armed bank robbery. However, in December 2001, while serving his 420-month sentence in US Penitentiary High Security (USP) Polluck, Petty murdered his cellmate. Petty received a life sentence for the murder at USP Polluck and was

transferred to the ADX in January 2003. Petty was housed at the ADX, C unit, Range 13, cell 40 from October 16, 2017 to September 19, 2020, and remains on range 13 to date.

5. **L.H.** was originally confined with the Mississippi Department of Corrections (MDOC). While incarcerated at the MDOC, L.H. had a history of assaulting staff and inmates. L.H. was transferred to the ADX as a state inmate in December 2007. L.H. was housed in the C unit, range 13, cell 30 from October 16, 2019 to December 13, 2019, and then again from July 16, 2020 until his death on September 19, 2020.

*Case Background*

6. This investigation began on September 19, 2020 upon notification from the BOP that a homicide had occurred at the ADX, C unit, range 13. BOP staff identified the assailant as Ishmael Petty and the victim as L.H.

7. This crime occurred in the ADX, C unit, range 13. More specifically, the indoor recreation cell located between cells 30 and 40. The cells on range 13 are designed to reduce the need for officers to have physical contact with the inmates to move them from their cells to the law library or recreation. As such, the doors are opened and closed electronically, and the inmates move through the sally port doors from their cells to the indoor recreation cell. At the time of the homicide, there was a metal food tray slot inside the indoor recreation cell that accessed cell 40. The food slot was in place so officers could feed the inmate housed in cell 40 without physical contact. However, the food slot was not used frequently prior to the homicide.

*Video surveillance*

8. There are video surveillance cameras that capture the activity on range 13. On September 19, 2020, at approximately 6:49 am, L.H. was engaging in recreation in the inside recreation yard located between cells 30 and 40, and Petty was in cell 40.

9. At approximately 7:48 am, a BOP officer was conducting rounds on the range. He stopped and talked to inmate Petty, and then spoke to inmate L.H. After speaking with L.H., the officer walked over to a light switch, flipped off the lights on the recreation yard, and departed the area. The lights on the recreation yard went off at approximately 7:50 am. An interview of the officer revealed inmate Petty asked him how many inmate telephone calls were scheduled that day, and L.H. asked him to turn off the lights on the recreation yard.

10. At approximately the same time the lights turned off on the recreation yard, Petty turned off the lights in his cell and went to his bed, which was located under the food slot. There was still ambient light in Petty's cell from his television. Petty stood back up, walked over to the television, angled it toward the rear of cell, and then returned to the food slot. At approximately 8:11 am, Petty went back to his television and turned it off, eliminating the ambient light in the cell.

11. At approximately 8:26 am, Petty turned the lights back on in his cell. He moved his television back to its original position, moved his rolled-up mattress to place it near the food slot, and began packing items into bags.

12. At approximately 8:42 am, Petty put on his pants and tucked in his shirt, at which point a weapon sheath could be seen on his right hip. At approximately 8:49 am, Petty moved back to the food slot and appeared to place his arm into the slot. His upper body began making fast, jerky movements. Petty paused for a few moments, and then returned to the food slot. Petty appeared to place his arm into the slot again, and his upper body could be seen making fast, jerky movements.

*Discovery of L.H. death*

13. At approximately 9:09 am, an officer conducted a round on range 13. When the officer arrived at Petty's cell, Petty was standing at the inner grill and initiated a conversation with the officer. Petty told the officer, "you don't know me, but I'm sure you have heard some really bad things about me. I am homicidal. A homicide just occurred. I killed [L.H.]." Petty went on to tell the officer to call the captain and the FBI because a homicide had just occurred.

14. Once Petty was finished speaking, the officer repeated Petty's words back to him to confirm what Petty said. Petty confirmed the officer heard him correctly. The officer then exited the range and notified the other officers in the unit.

15. When officers returned to the range and the lights on the recreation yard were turned on, L.H. was observed slumped over under the food slot, which connected to cell 40. L.H. was naked, with a bag over his head, bindings on his hands and feet, and a noose around his neck. The noose ran through the food slot into Petty's cell, where it was tied off.

16. Responding officers cut the noose from L.H.'s neck and began CPR. An AED was also placed on L.H., but when it cycled, it indicated no shock was advised. L.H. was placed on a gurney and transported to the medical office. Officers continued CPR until American Medical Response (AMR) arrived at the facility. After examining L.H., AMR staff determined nothing could be done to save his life and directed BOP staff to halt life saving measures.

17. An autopsy performed on inmate L.H. revealed he died by ligature strangulation. The medical examiner also noted superficial wounds on L.H.'s neck and shoulder.

*Homemade knife*

18. A team of officers went to Petty's cell to extract him from the cell following the homicide. Petty asked the officers if he should "strip-out," and the lieutenant in charge of the team confirmed he should. Petty removed his pants, which had a sheath and homemade knife on the waistband and threw them to the front of the cell. Petty was visually searched, placed in restraints, and removed from the cell. Petty's pants, which contained the sheath and homemade knife, were left in the sally port of the cell.

19. The FBI Evidence Response Team (ERT) conducted a search of the crime scene, which included cells 30 and 40, the law libraries for cells 30 and 40, and the indoor recreation cell. Among the items recovered by the FBI ERT were Petty's pants with the homemade knife and sheath.



*[Photographs of homemade knife recovered from the sallyport of Petty's cell]*

*Interview of inmate Petty*

20. During a post-*Miranda* interview, Petty informed FBI SA Amber Cronan that he tricked L.H. into believing he and L.H. would stage a hostage-taking situation, which L.H. could then use as the basis of a civil lawsuit against the BOP. In support of the "fake" hostage-situation, L.H. voluntarily submitted to stripping naked, binding his own hands and feet, placing a bag over his head, and allowing Petty to place a noose around his neck. Petty indicated he told L.H. being naked and strangled with a black bag over his head would make the scene look more like "Abu Ghraib." Petty informed his interviewer that even though L.H. believed this was going to be a "fake" hostage situation, it was always Petty's intention to kill L.H. once L.H. was in a vulnerable state. Petty indicated that once L.H. was naked and bound with the noose around his neck, Petty strangled him until he was deceased. Petty indicated he checked L.H. for a pulse, felt none, and then stabbed L.H. approximately 60 times in the back. Petty subsequently alerted staff to the homicide.

*Laboratory exams*

21. The homemade knife collected from the sally port of Petty's cell and a blood card collected during L.H.'s autopsy were submitted to the FBI laboratory for examination. Petty's fingerprints were discovered on the homemade knife, and DNA from three males was detected on the cloth handle. One of the DNA contributors was L.H.; the other two DNA contributors were unknown males.

*DNA Comparison*

22. Based on my training and experience, I know that trace amounts of DNA can be left behind on objects when they are touched or handled. This DNA can be collected from the objects and compared to known samples, thereby connecting the assailant to the weapon.

**Conclusion**

23. Inmate Petty stated during a post-*Miranda* interview that he strangled inmate L.H. to death and then stabbed him approximately 60 times in the upper back. Superficial stab wounds were observed on L.H.'s upper back and neck during autopsy. Video surveillance showed Petty had a homemade knife on his person, and reached into the food slot making jerking motions, which was likely Petty inflicting the superficial wounds

detected on L.H.'s upper back and neck. Petty subsequently removed his pants, which contained the homemade knife, and threw them into the sally port, where they were recovered by the FBI ERT.

24. Based on the facts set forth above, I submit probable cause exists to believe the homemade knife found in the sally port of Petty's cell was used by inmate Petty to make the puncture wounds observed on inmate L.H.'s body during autopsy. Moreover, there is probable cause to believe the collection of DNA (buccal oral swab samples) from Petty, when compared to samples retrieved from the weapon, may yield evidence to show Petty used the weapon to stab inmate L.H..

25. For the above reasons, I respectfully request the Court issue a search warrant authorizing the FBI to search Ishmael Petty, as outlined in Attachment A, in order to collect a DNA sample for comparison to the homemade knife seized in this case.

s/Amber K. Cronan
Amber K. Cronan
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 18th day of March, 2025.

HON. N. REID NEUREITER
UNITED STATES MAGISTRATE
JUDGE UNITED STATES DISTRICT
COURT DISTRICT OF COLORADO

**This affidavit was reviewed and submitted by Brian Dunn, Assistant United States Attorney.**